**Case Nos. 09-71383 & 09-71404**

# IN THE UNITED STATES COURT OF APPEALS

## FOR THE NINTH CIRCUIT

ASSOCIATION OF IRRITATED RESIDENTS, et al.,
Petitioners

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al.,
Respondents

AND

NATURAL RESOURCES DEFENSE COUNCIL, INC.,
Petitioner

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,
Respondent

Petition for Review
of a final action of the Environmental Protection Agency

---

**PETITIONERS' JOINT OPENING BRIEF**

---

MARYBELLE N. NZEGWU
BRENT J. NEWELL
Center On Race, Poverty
& The Environment
47 Kearny Street, Suite 804
San Francisco, CA 94108
Telephone: (415) 346-4179
Facsimile: (415) 346-8723

DAVID PETTIT
MELISSA LIN PERRELLA
ADRIANO MARTINEZ
Natural Resources Defense Council
1314 Second Street
Santa Monica, CA 90401
Telephone: (310) 434-2300
Facsimile: (310) 434-2399

*Counsel for Petitioners Association of Irritated
Residents, El Comité Para El Bienestar De
Earlimart, and Community Children's Advocates
Against Pesticide Poisoning*

*Counsel for Petitioner National Resources
Defense Council*

**Dated: August 21, 2009**

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Petitioners, Association of Irritated Residents, El Comité Para El Bienestar De Earlimart, and Community Children's Advocates Against Pesticide Poisoning, and Natural Resources Defense Council state that they are nonprofit organizations that have no parent companies and are not traded for profit.

## STATEMENT OF RELATED CASES

In *El Comité para el Bienestar de Earlimart v. U.S. Environmental Protection Agency*, No. 08-74340 (9th Cir.), Petitioners Association of Irritated Residents, El Comité para el Bienestar de Earlimart, and Community and Children's Advocates Against Pesticide Poisoning challenge EPA's approval of the 1994 Ozone State Implementation Plan.  On June 30, 2009, this Court denied Petitioners' Motion to Consolidate No. 08-74340 with this Petition, but ordered that both petitions for review be calendared together for oral argument.

# TABLE OF CONTENTS

STATEMENT OF JURISDICTION…………………………………………….1

ISSUES PRESENTED FOR REVIEW………………………………………….1

STATEMENT OF CASE………………………………………………………..2

STATEMENT OF FACTS………………………………………………………3

SUMMARY OF ARGUMENT…………………………………………………...19

ARGUMENT…………………………………………………………………...21

I.      STANDARD OF REVIEW……………………………………………..21

II.     PETITIONERS HAVE STANDING……………………………………23

      A.      Petitioners Have Suffered, and Will Continue to Suffer
            an Injury-In-Fact……………………………………………………….25

      B.      Petitioners Satisfy the Causation Test……………………………29

      C.      Claims Will be Redressed by the Relief Sought……………………31

III.    THE EPA'S FAILURE TO REQUIRE A PLAN THAT MEETS
       ATTAINMENT OF THE 1-HOUR STANDARD VIOLATES THE
       ACT…………………………………………………………………...31

      A.      EPA Violated its Duty to Ensure the 2003 South Coast
            Plan Demonstrates Attainment……………………………………...33

      B.      EPA"s Failure to Require a New Attainment Demonstration
            is Arbitrary and Capricious in Light of Significant New
            Information that Rendered the Outdated 1997/1999 Plan
            Ineffective..……………………………………………………………35

      C.      The 2003 South Coast Plan is Not Discretionary, and EPA
            Must Require an Updated Plan Because the Prior Plan is

Patently Out of Date……………………………………………36

IV.   EPA'S RE-APPROVAL OF THE PESTICIDE ELELMENT'S
DISCRETIONARY COMMITMENT TO ADOPT REGULATIONS
VIOLATES THE ACT……………………………………………..39

    A.    Commitments to Adopt Regulations Must be Enforceable…………40

    B.    The Pesticide Element's Commitment to Adopt Regulations
        is Unenforceable…………………………………………………42

        1.    EPA has interpreted what is necessary to make the Pesticide
             Element enforceable.

             a.    *1994 Ozone SIP approval*………………………….42

             b.    *2008 Ventura SIP Revision*…………………………43

             c.    *The 2003 State Strategy*……………………………45

        2.    The Ninth Circuit Held in *Warmerdam* that the Pesticide
             Element's Commitment to Adopt Regulation is
             Unenforceable……………………………………………..45

    C.    EPA's Re-Approval of the Pesticide Element Violates
        the Act…………………………………………………………46

V.    EPA UNLAWFULLY APPROVED CARB'S SIP REVISION
IN VIOLATION OF CLEAN AIR ACT § 182(D)(1)(A), WHICH
REQUIRES SEVERE NONATTAINMENT AREAS TO ADOPT
ENFORCEABLE TRANSPORTATION CONTROL MEASURES……47

VI.   CONCLUSION AND RELIEF REQUESTED…………………………..60

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Abramowitz v. EPA,*
832 F.2d 1071 (9th Cir. 1987)……………………….…………………………25

*Almendarez-Torres v. U.S.,*
523 U.S. 224 (1998)……………………………………..…………..23

*Arizona v. Thomas,*
294 F.2d 834 (9th Cir. 1987)……………………………………………...32

*Bayview Hunters Point Cmty. Advocates v. Metro. Transp. Comm'n,*
366 F.3d 692 (9th Cir.2004)………………………………………………...41

*Bernhardt v. County of Los Angeles,*
279 F.3d 862 (9th Cir. 2002)………………………………………………...29

*Biodiversity Legal Foundation v. Badgley,*
309 F.3d 1166 (9th Cir. 2002)……………………………………………...29, 56

*Brown v. Gardner,*
513 U.S. 115 (1994)…………………………………………………………52

*Chevron U.S.A., Inc. v. NRDC,*
467 U.S. 837 (1984)…………………………………………………*passim*

*City of Los Angeles v. Lyons,*
461 U.S. 95 (1983)…………………………………………………..28

*Colautti v. Franklin,*
439 U.S. 379 (1979)…………………………………………………………54

*Conservation Law Found. Inc. v. Busey,*
79 F.3d 1250 (1st Cir. 1996)……………………………...………41

*Delaney v. EPA,*
898 F.2d 687 (9th Cir. 1990)…………………………………………25, 32

*Duncan v. Walker*,
533 U.S. 167 (2001)…………………………………………………………54

*Ecological Rights Foundation v. Pacific Lumber Co.*,
230 F.3d 1141 (9th Cir. 2000)………………………………………...27, 31

*El Comité para el Bienestar de Earlimart v. Helliker*,
416 F.Supp.2d 912 (E.D. Cal. 2006)…………………………………...16

*El Comité para el Bienestar de Earlimart v. Warmerdam*
539 F.3d 1062……………………………………………………...16, 20, 45

*Eisinger v. Fed. Labor Relations Auth.*,
218 F.3d 1097 (9th Cir.2000)……………………………………..…56

*Engine Mfrs. Ass'n v. EPA*,
88 F.3d 1075 (D.C. Cir. 1996)………………………………………51

*Environmental Defense Fund*,
167 F.3d 641 (D.C. Cir. 1999)……………………...…………………..37

*Friends of the Earth v. Laidlaw*,
528 U.S. 167 (2000)………………………………...……………………26

*Gallarde v. INS*,
486 F.3d 1136 (9th Cir. 2007)……………………………….……………52

*General Motors Corp. v. United States*,
496 U.S. 530 (1990)…………………………………………….42, 47

*Hall v EPA*,
273 F.3d 1146 (9th Cir. 2001)……………………………….…22, 25, 32

*Hall v. Norton*,
266 F.3d 969 (9th Cir. 2001)……………………………..……….27

*Hernandez v. Ashcroft*,
354 F.3d 824 (9th Cir. 2003)……………………………….…58

*K-Mart Corp. v. Cartier Inc.*,
486 U.S. 281 (1988)…………………………………………………………..22, 52

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992)…………………………………………………………..25, 28

*Maislin Indus. v. Primary Steel, Inc.*,
497 U.S. 116 (1999)…………………………………………………………..49, 59

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto Ins. Co.*,
463 U.S. 29 (1983)……………………………………………………………23, 35

*New York v. EPA*,
443 F.3d 880 (D.C. Cir. 2006)……………………………………………….51

*NRDC v. EPA*,
507 F.2d 905 (9th Cir. 1974)………………………………………………...25

*Ober v. EPA*,
84 F.3d 304 (9th Cir. 1996)………………………………………………...22, 25

*Ortiz v. Meissner*,
179 F.3d 718 (9th Cir. 1999)………………………………………………...22

*Padash v. INS*,
358 F.3d 1161 (9th Cir. 2004)……………………………………….23, 54, 58

*Quinlivan v. Sullivan*,
916 F.2d 524 (9th Cir. 1990)………………………………………………...58

*Rettig v. Pension Benefit Guar. Corp.*,
744 F.2d 133 (D.C. Cir. 1984)……………………………………………….23

*Safe Air for Everyone v. EPA*,
475 F.3d 1096 (9th Cir.2007)……………………………………………....22, 46

*US v. SCRAP*,
412 U.S. 669 (1973)………………………………………………………28

*Sierra Club v. EPA*,
129 F.3d 137 (D.C. Cir. 1997)……………………………………….…17

*Sierra Club v. Morton*,
405 U.S. 727 (1972)…...……………………………………………24, 27, 28

*South Coast Air Quality Management District v. EPA*,
472 F.3d 882 (D.C. Cir. 2006)……………………………………………7, 47

*Swan v. Clinton*,
100 F.3d 973 (D.C. Cir. 1996)……………………………………………..31

*Train v. NRDC*,
421 U.S.  60………………………………………………………………32

*Union Elec. Co. v. EPA*,
427 U.S. 246……………………………………………………………..…4

*U.S. v. LSL Biotechnologies*,
379 F.3d 672 (9th Cir. 2004)…………………………………………....54

*Valley Forge Christian Coil. v. Ams. United for Separation of Church & State, Inc.*,
454 U.S. 464 (1982)………………………………………………….....24

*Vigil v. Leavitt*,
381 F.3d 826 (9th Cir. 2004)……………………………………….....21

*Warth v. Seldin*,
422 U.S. 490 (1975)……………………………………………………29

*Whitman* v. *American Trucking Associations*,
531 U.S. 457 (2001)……………………………………………...…26

*Wilderness Society v. USFWS*,
353 F.3d 1051 (9th Cir. 2003)……………………….................................22

# FEDERAL STATUTES

United States Code:

5 U.S.C. § 702……………………………………………………………22
5 U.S.C. § 706……………………………………………………………..20, 22
23 U.S.C. § 134……………………………………………………………18, 38
42 U.S.C. § 7401 ……………………………………………………………4
42 U.S.C. § 7407……………………………………………………………4
42 U.S.C. § 7408……………………………………………………49, 55, 56
42 U.S.C. § 7409……………………………………………………4, 26
42 U.S.C. § 7410……………………………………………............*passim*
42 U.S.C. § 7501……………………………………………………48
42 U.S.C. § 7502…………………………………………………… *passim*
42 U.S.C. § 7506……………………………………………………37
42 U.S.C. § 7511……………………………………………...……………4, 6
42 U.S.C. § 7511a………………………………………………… *passim*
42 U.S.C. § 7604……………………………………………...40, 41
42 U.S.C. § 7607……………………………………………...1, 21, 59
49 U.S.C. § 5303……………………………………………...18, 38
49 U.S.C. § 5304……………………………………………………38

# OTHER AUTHORITIES

23 C.F.R. § 450.218………………………………………………………….38

40 C.F.R. §§ 52.220………………………………………… …………………14

40 C.F.R. § 81.305…………………………………………………...2, 13

40 C.F.R. § 93.118………………………………………………….......37

44 Fed. Reg. 8220 (Feb. 9, 1979)…………………………………………..6

58 Fed. Reg. 62188 (Nov. 24, 1993)……………………...……………….17

61 Fed. Reg. 10920 (March 18, 1996)……………………. ………………...13

62 Fed. Reg. 1150 (Jan. 8, 1997)……………………………………….14, 41, 43

62 Fed. Reg. 38856 (Jul. 18, 1997)……………………………………………...6

69 Fed. Reg. 15325 (Mar. 25, 2004)……………………………………….17, 38

69 Fed. Reg. 23858 (Apr. 30, 2004)…………………………………….6, 7, 8

73 Fed. Reg. 41277 (July 18, 2008)………………………………..15, 41, 43, 44

73 Fed. Reg. 21885 (Apr. 23, 2008)……………………………………….15, 41

73 Fed. Reg. 63409 (Oct. 24, 2008)………………………………………26

## STATEMENT OF JURISDICTION

This is a petition for review of a final action of the United States
Environmental Protection Agency ("EPA") made under the Clean Air Act ("the
Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 7607(b)(1), which
provides that a petition for review of a final EPA action "which is locally or
regionally applicable" may be filed "only in the United States Court of Appeals for
the appropriate circuit." A petitioner must file a petition for review within 60 days
from the date the notice of the final action appeared in the Federal Register. *Id*.
EPA published the final rule at issue in this petition in the Federal Register on
March 10, 2009. Excerpts of Record ("ER"), at 001. The Association of Irritated
Residents ("AIR"), El Comité Para El Bienestar De Earlimart, and Community and
Children's Advocates Against Pesticide Poisoning timely filed its petition for
review on May 8, 2009. The Natural Resources Defense Council ("NRDC")
timely filed its petition for review on May 11, 2009. On June 29, 2009, this Court
consolidated these separate petitions.

## ISSUES PRESENTED FOR REVIEW

1. Whether EPA acted arbitrarily, capriciously and illegally by failing to
   require California to submit a plan that demonstrates attainment of the 1-
   hour ozone standard after approving the updated emissions inventory and
   concurrently disapproving the attainment demonstration.

1

2. Whether EPA acted arbitrarily, capriciously and illegally when it re-approved the Pesticide Element's discretionary commitment to adopt regulations.

3. Whether EPA acted arbitrarily, capriciously and illegally by failing to require California to submit Transportation Control Measures when it was shown that vehicle miles traveled increased in the Los Angeles-South Coast Air Basin.

## STATEMENT OF CASE

Congress passed the Clean Air Act thirty-eight years ago, yet residents in the Los Angeles—South Coast Air Basin ("South Coast")[1] and many parts of California continue to breathe air that fails to meet federal health-based clean air standards for ozone. This petition seeks to vindicate Californian's statutory right to safe and healthy air. The Clean Air Act ("Act") requires states with areas that fail to meet clean air standards to develop plans that serve as a mandatory roadmap to achieve the standards. States must submit these plans to EPA for approval, and when approved, the plans become part of the State Implementation Plan ("SIP"or "clean air plan") and binding upon the states as a matter of federal law. EPA had the chance to put California on a track to clean air when EPA considered whether

---

[1] South Coast includes the southwestern two-thirds of Los Angeles County, all of Orange County, western Riverside County, and Southwestern San Bernardino County. *See generally* 40 C.F.R. § 81.305.

to approve or disapprove parts of the ozone plans adopted by California in 2003. Instead, EPA chose to take actions that violate the Act in three ways:

1. EPA violated the Act when it did not require that California submit a new ozone plan even though the EPA found that the 2003 ozone plans would not achieve the federal ozone standard by the legal deadline of 2010;

2. EPA violated the Act when it approved unenforceable measures, including a commitment to adopt regulations to control pesticide air pollution; and

3. EPA violated the Act when it failed to require a Transportation Control Measure plan—i.e. a plan to reduce pollution from the transportation system such as creation of improved public transportation—despite an increase in vehicle miles traveled in the South Coast.

The Act requires EPA to ensure that California's clean air plans attain the health-based ozone standard, provide for attainment using enforceable measures, and require Transportation Control Measures when vehicle miles traveled increase. As a remedy, the Court should vacate EPA's approval and remand the matter to EPA.

## STATEMENT OF FACTS

*Statutory Background*

Congress enacted the Act as "a drastic remedy to what was perceived as a serious and otherwise uncheckable problem of air pollution," *Union Elec. Co. v.*

*EPA,* 427 U.S. 246, 256 (1976).  Congress intended to protect and enhance the nation's air quality in order to promote public health and welfare.  42 U.S.C. § 7401(b).  To achieve this objective, Congress imposes a carefully calibrated system where EPA promulgates national ambient air quality standards ("NAAQS" or "clean air standards") for harmful air pollutants that are sufficient "to protect public health" with "an adequate margin of safety," 42 U.S.C. § 7409, and directs the states to devise "clean air plans" for bringing polluted areas into compliance with these health-based standards.  42 U.S.C. § 7410.  EPA designates areas as either "attainment" or "nonattainment" based on whether they meet the clean air standards for a particular pollutant.  42 U.S.C. § 7407(d).

Areas that fail to meet clean air standards—nonattainment areas—receive different classifications based on the severity of an area's pollution.  EPA classifies areas with the lowest levels of ozone pollution as "Marginal" and classifies the worst areas as "Extreme."  42 U.S.C. § 7511(a).  Both the South Coast and the San Joaquin Valley are classified as "Extreme."[2]  The Act requires nonattainment areas to submit attainment plans that demonstrate the state will meet clean air standards

---

[2] Both areas are classified as "Extreme" for the 1-hour ozone standard.  On August 18, 2009, the EPA Regional Administrator for Region IX signed a proposed rule to re-classify both of these regions as "Extreme" for the 8-hour ozone standard.  EPA, Air Actions, California *available at* http://www.epa.gov/region09/air/actions/ca.html.  As of the filing of the brief, it has not been published in the Federal Register.

to EPA for approval, showing in detail when and how federal standards will be met.  42 U.S.C. §§ 7410(a), 7511a.

Attainment plans have two main components: (1) the attainment demonstration, for which Congress mandated that, using predictive computer modeling, the plan must demonstrate that the area will meet the NAAQS by the statutory deadline, 42 U.S.C. § 7511a(c)(2)(a), (d), (e); and (2) the state's control enforceable strategy to achieve emissions reductions necessary to attain the clean air standard.  42 U.S.C. § 7410(a)(2)(A).

*Ozone Pollution and Its Health Impacts*

Ozone—commonly referred to as smog—forms in the presence of heat and sunlight through a chemical reaction among two families of chemicals: volatile organic compounds ("VOC") and nitrogen oxides ("NOx").  As EPA has articulated "[o]zone causes serious health problems by damaging lung tissue and sensitizing the lungs to other irritants. When inhaled, even at very low levels, ozone can cause acute respiratory problems; aggravate asthma; cause temporary decreases in lung capacity of 15 to 20 percent in healthy adults, cause inflammation of lung tissue, lead to hospital admissions and emergency room visits; and impair the body's immune system defenses, making people more susceptible to respiratory illnesses, including bronchitis and pneumonia."  ER, at 009.  EPA has further noted that "[c]hildren are most at risk from exposure to

5

ozone because they breathe more air per pound of body weight than adults; their respiratory systems are still developing and thus more susceptible to environmental threats; and children exercise outdoors more than adults in the high-ozone months of summer." *Id.*

In 1979, under section 109 of the Act, EPA established a primary, health-based clean air standard for ozone: 0.12 parts per million ("ppm") averaged over a 1-hour period ("1-hour ozone standard"). *See* 44 Fed. Reg. 8220 (Feb. 9, 1979). When Congress amended the Act in 1990, it gave regions varying amounts of time to meet the 1-hour standard, depending on a region's pollution severity. "Extreme" areas—like the South Coast and the San Joaquin Valley—received 20 years to meet the standard and must do so by 2010. 42 U.S.C. § 7511(a).

In 1997, and after an extensive scientific review, EPA found that public health required a standard more stringent than the 1-hour standard. 62 Fed. Reg. 38856 (Jul. 18, 1997). Accordingly, EPA promulgated an additional ozone standard of 0.08 ppm averaged over an 8-hour period ("8-hour standard"). *Id.*

On April 30, 2004, EPA designated areas throughout the nation as "attainment" or "nonattainment" of the 8-hour standard. 69 Fed. Reg. 23858 (Apr. 30, 2004). EPA included the South Coast, the San Joaquin Valley, and several other parts of California as areas violating this more health protective 8-hour standard. *Id.* at 23884. Currently, the South Coast and the San Joaquin Valley

have until 2020 and 2013 respectively to meet the new 8-hour standard, but both have requested that they be given until 2024. *Id.*

Also on April 30, 2004, EPA promulgated an ozone implementation rule. 69 Fed. Reg. 23951 (Apr. 30, 2004). Among other things, EPA revoked the 1-hour standard. *Id.* at 23996. Because the 8-hour standard's designations for almost all areas of the nation were effective June 15, 2004, this meant that EPA effectively abolished the 1-hour standard in those areas after June 15, 2005. As of June 15, 2005, only the South Coast and San Joaquin Valley were classified as "Extreme" for the 1-hour standard (i.e. areas with the worst ozone pollution) in the country. EPA, Green Book, *available at* http://epa.gov/air/oaqps/greenbk/onc.html (listing area designations under the 1-hour standard as of June 15, 2005).

Several states, industry associations, environmental organizations and other government agencies challenged the 8-hour standard implementing rule in *South Coast Air Quality Management District v. EPA*, 472 F.3d 882 (D.C. Cir. 2006). The D.C. Circuit held that EPA could revoke the 1-hour standard, but that 1-hour standard controls must remain in place to prevent backsliding. *Id.* at 899. Thus, States must comply with the provisions to meet the 1-hour standard in order to attain the 8-hour standard.

7

*California's Air Pollution Problems*

California has the most intractable ozone problem in the nation. Despite significant work to control ozone concentrations over the years, several places in the State continue to violate ozone standards. 69 Fed. Reg. 23881 (Apr. 30, 2004). In 2003, the California Air Resources Board ("CARB") estimated that "attaining the State's own health-based air quality standards for particulate matter and ozone would annually prevent:

- 6,500 premature deaths,
- 10,000 hospital admissions,
- 350,000 asthma attacks, and
- 2.8 million lost work days."

ER, at 239-40.[3] Emblematic of the chronic failure to meet the standard is the South Coast, which continues to have the highest ozone concentrations in the nation. ER, at 009. To cure these impacts from high ozone levels, the State in conjunction with the South Coast Air Quality Management District ("SCAQMD" or the "District") sought to reduce ozone and other pollution. The latest EPA-approved plan for ozone in the South Coast is the 1997 Ozone Plan as amended by the 1999 Ozone Plan ("1997/1999 Plan"). ER, at 010.

The American Lung Association ranks the San Joaquin Valley counties of Kern, Tulare, and Fresno as the second, fourth, and seventh most ozone-polluted

---

[3] California's state air quality standards are generally more stringent than the federal standards.

counties in the United States, respectively. ER, at 022. The South Coast continues to have the highest ozone concentrations in the nation. ER, at 009.

Economists Jane V. Hall, Ph.D., and Victor Brajer, Ph.D., published a comprehensive analysis of the effects from not meeting the 8-hour standard and the most recent clean air standard for fine particulate matter (PM2.5). For example, the health effects of not meeting these standards, and their concomitant economic values, inflict a conservative measurable cost of $5.7 billion each year –$1,600 per person – in the San Joaquin Valley. ER, at 023. While these data are not directly related to the failure to meet the 1-hour ozone standard, attaining the 1-hour standard reflects progress towards attaining the 8-hour standard and the 2008 PM2.5 standard (NOx and VOC emission reductions are also needed to meet PM2.5 standards). Thus, a meaningful plan to attain the 1-hour standard by the 2010 deadline also means progress towards solving the health and economic consequences of the air quality crisis in the South Coast and the San Joaquin Valley.

*The 2003 Ozone Plans at Issue Here*

On October 23, 2003, CARB approved the 2003 State Strategy, a statewide strategy for attaining the 1-hour standard, and the South Coast specific plan to meet that standard ("2003 South Coast Plan"). ER, at 010-11.

The attainment plan for each region of California consists of two elements: 1) the State Strategy adopted by CARB and 2) the regional specific plan adopted by the local air district (e.g. the 2003 South Coast Plan).  CARB develops the State Strategy to control pollution on a statewide basis, so the measures apply to the entire state.  Air districts, such as the SCAQMD, are charged with developing, subject to CARB approval, region-specific plans.  The two pieces form a comprehensive strategy for nonattainment areas.

CARB adopted the 2003 State Strategy in an effort to attain the 1-hour standard in the South Coast and the San Joaquin Valley.  ER, at 010.  The 2003 Plan improved both of the critical elements of the attainment plan—the modeled attainment demonstration and the control measures needed to attain the 1-hour standard by 2010.

First, the 2003 Plan updated the modeling.  CARB noted that new information demonstrated "the need for much greater emission reductions than the [1997/1999 Plan]."  ER, at 119.  Of particular significance, car and truck pollution estimates in the outdated 1997/1999 Plan were much lower than the 2003 State Strategy's estimates. The 2003 South Coast Plan set forth this underestimation by as much as 20 percent.

**Summary Chart From 2003 South Coast Plan**

|  | NOx Emissions From On-Road Motor Vehicles (tons/day) | VOC Emissions From On-Road Motor Vehicles (tons/day) |
|---|---|---|
| 1997 Plan | 606 | 443 |
| 2003 Plan | 761 | 519 |
|  | ~ 20% increase | ~15% increase |

ER, at 156, 158. Since the District estimated that motor vehicles account for 88% of NOx and 53% of total VOC emissions in the South Coast, this was a significant departure from what was required to show attainment in the 1997/1999 Plan. ER, at 166.

Second, based on the new air quality modeling that showed an increase in emissions of ozone precursors, CARB and the District needed to add additional measures to attain the 1-hour standard. The District provided the following rationale for the needed amendment to the plan:

> [The 1997/1999 Plan was] based on demographic forecasts of the mid-1990's using 1993 as the base year. Since then, updated demographic data has become available, new air quality episodes have been identified, and the science for estimating motor vehicle emissions and air quality modeling techniques for ozone and PM10 have improved. Therefore, a plan update is necessary to ensure continued progress toward attainment and to avoid a transportation conformity lapse and associated federal funding losses.

ER, at 113. Accordingly, CARB committed to several additional measures to control ozone pollution in the 2003 State Strategy.

11

*The Pesticide Element of the 2003 State Strategy*

The 2003 State Strategy commits to a strategy to "Implement Existing Pesticide Strategy." ER, at 286. As included in the 2003 State Strategy, the Pesticide Strategy does not include a final action date. EPA's approval of the 2003 State Strategy "maintain[s] the status quo with respect to the existing pesticide strategy (i.e., the SIP will continue to reflect the strategy as approved by EPA in 1997)." ER, at 001, 006, 286.

*The 1994 Ozone SIP*.

ARB adopted the existing pesticide strategy as the "Pesticide Element" of the 1994 Ozone State Implementation Plan ("1994 Ozone SIP"). In the Pesticide Element, ARB committed to reduce VOC emissions from agricultural and structural pesticides in the South Coast, Sacramento, San Joaquin Valley, Ventura, and Southeast Desert ozone nonattainment areas by 20% from 1990 levels by 2005. ER, at 057. California submitted the Pesticide Element to EPA as part of the 1994 Ozone SIP. As originally submitted, the Pesticide Element did not contain clear enforceable commitments, so EPA requested a more definitive promise "to support SIP approvability." ER, at 047-48, 049-50, 051-52.

On May 9, 1995, Department of Pesticide Regulation ("DPR") Director James Wells complied, and wrote a memorandum to CARB Executive Officer James Boyd (the "Wells Memorandum") (ER, at 053-54).

12

The Wells Memorandum states:

> The Department of Pesticide Regulation commits to adopt and submit to U.S. EPA by June 15, 1997, any regulations necessary to reduce volatile organic compound emissions from agricultural and commercial structural pesticides by specific percentages of the 1990 base year emissions, by specific years, and in specific nonattainment areas (described in 40 C.F.R. 81.305), as listed in the following table:

**Reductions from 1990 Baseline**

| Ozone Nonattainment Area | 1996 | 1999 | 2002 | 2005 |
|---|---|---|---|---|
| Sacramento Metro | 8% | 12% | 16% | 20% |
| San Joaquin Valley | 8% | 12% | 16% | 20% |
| South Coast | 8% | 12% | 16% | 20% |
| Southeast Desert | 8% | 12% | 16% | 20% |
| Ventura | 8% | 12% | 16% | 20% |

ER, at 053-54.  CARB submitted the Wells Memorandum to EPA, calling the memorandum "a clarification" of what was "in the SIP."  ER, at 053-54.

With this enforceable promise in hand, EPA proposed approval of the 1994 Ozone SIP.  61 Fed. Reg. 10920 (March 18, 1996) ("Proposed Rule").  EPA described the Wells Memorandum as a "clarification" of the "technical details of the pesticide commitment."  *Id*. at 10935.  EPA stated that the "clarification is considered part of the SIP."  *Id*.  EPA referenced the Wells Memorandum and the CARB letter in a footnote.  *Id*.

On June 13, 1996, CARB sent another letter to EPA Region IX Air Division Director David Howekamp (the "Howekamp Letter") asking for various

corrections to the Proposed Rule.  ER, at 055-57.  The Howekamp Letter requested

that EPA delete the table "Reductions from 1990 Pesticide Emissions Baselines,"

stated that the pesticide "*commitment is for a 20% reduction from 1990 levels by*

*2005 in each SIP area, except [San Diego]*."  ER, at 057 (emphasis added).

In 1997, EPA approved the Pesticide Element and the Howekamp Letter as

part of the State Implementation Plan.  62 Fed. Reg. 1150, 1186-1187 (Jan. 8,

1997); 40 C.F.R. §§ 52.220(c)(204)(i)(A)(6), 52.220(c)(236)(i)(A)(1).  In the final

rulemaking, EPA affirmed that it was approving a non-discretionary commitment

to adopt regulations in the Pesticide Element.  62 Fed. Reg. at 1155, 1169-1170.

EPA responded to a comment from the Environmental Defense Center that

questioned whether the "pesticide measure should be granted credit" because the

proposed rule referred to a June 1997 deadline to adopt regulations while "the SIP

itself recites a possible, not obligatory, 1998 date."  *Id*. at 1169.  EPA responded to

the comment by referring to the Wells Memorandum and stated that DPR's

commitment to adopt regulations by June 15, 1997 deadline was an enforceable

element of the SIP.  *Id*. at 1170.

Six years later, CARB adopted the 2003 State Strategy, which includes a

strategy called PEST-1 to "Implement Existing Pesticide Strategy" called PEST-1:

> As described in the 1994 SIP and U.S. EPA's notice approving that plan,
> DPR committed to reduce VOC emission from pesticides through voluntary
> measures with a regulatory backstop.  Specifically, DPR committed to adopt
> and submit to U.S. EPA by June 15, 1997, any regulations necessary to

14

> reduce VOC emission from agricultural and commercial structural pesticides by specific percentages of the 1990 base year emissions, by specific years, and in specific nonattainment areas.  For the South Coast, the commitment is to reduce VOC emissions from pesticides to a level 20 percent below 1990 base year emissions by the attainment year.

ER, at 256.

In 2008, EPA approved a revision to the Pesticide Strategy for the Ventura nonattainment area *only*, in which EPA interpreted the Pesticide Commitment.  *See* 73 Fed. Reg. 21885, 21886 (Apr. 23, 2008); 73 Fed. Reg. 41277, 41281 (Jul. 18, 2008).  EPA stated that the pesticide commitment is to adopt any rules necessary by June 15, 1997 to achieve a percentage reduction in 2005 *and* a tonnage reduction in the attainment year.  73 Fed. Reg. at 41281 ("our interpretation of the original Pesticide Element commitment as having both a tonnage reduction commitment in addition to the percent reduction commitment").  EPA then describes the commitment as including the June 15, 1997 date to adopt "any regulations necessary."  *Id.*

> Under the original Pesticide Element, for the Ventura County nonattainment area (Ventura), the California Department of Pesticide Regulation (DPR) committed to adopt and submit to EPA by June 15, 1997, any regulations necessary to reduce VOC emissions from agricultural and structural pesticides by 20 percent of the 1990 base year emissions by 2005.

Id. at 41277.

*El Comité para el Bienestar de Earlimart v. Warmerdam*

Several of the Petitioners here successfully enforced the Wells

Memorandum in U.S. District Court.  *See El Comité para el Bienestar de*

*Earlimart v. Helliker*, 416 F.Supp.2d 912 (E.D. Cal. 2006).  On August 20, 2008,

shortly after EPA approved the Ventura revision, this Court interpreted the

Pesticide Element and held that the commitment to adopt regulations by June 15,

1997 in the Wells Memorandum was discretionary.  This Court held that the

California SIP does not include the "Wells Memorandum."  *El Comité para el*

*Bienestar de Earlimart v. Warmerdam*, 539 F.3d 1062, 1069-1072.  The Ninth

Circuit stated:

> Because we conclude that the schedule and interim standards of the Wells
> Memorandum are not part of the SIP, California would not have been in
> violation of the SIP even if it had made no decision about the need for
> further regulations.

*Id*. at 1069.  Under *Warmerdam*, there is no enforceable commitment to adopt

regulations in the Pesticide Element of the 1994 Ozone SIP.

*EPA Action on the 2003 Ozone Plans*

On January 9, 2004, the CARB submitted the 2003 State Strategy and the

2003 South Coast Plan to EPA.  On March 25, 2004, the Federal Register

published EPA's Notice of Adequacy of the Motor Vehicle Emission Budgets

16

("MVEBs")[4] for the South Coast based partially on its assessment "that the [2003 South Coast SIP] provide[s] for attainment or maintenance (as appropriate) of the relevant ambient air quality standard." 69 Fed. Reg. 15325 (Mar. 25, 2004). This means that EPA determined that with all the commitments the various agencies made in the plan, the South Coast would reduce pollution enough to meet the 1-hour standard. Accordingly, EPA "preliminarily determined that the [2003 South Coast Plan] submittal provides for progress and *attainment* of the 1-hour ozone, PM10, and CO NAAQS, and maintenance of the nitrogen dioxide ("NO2") NAAQS, and that the budgets associated with the plans are consistent with the plan and, therefore, can be found adequate." *Id.* (emphasis added). Under the Act, federal funds for transportation projects are conditioned on an adequate demonstration that those projects will not frustrate attainment. *Sierra Club v. EPA*, 129 F.3d 137, 140 (D.C. Cir. 1997). Thus, transportation projects that could have resulted in increased emissions in the South Coast were allowed to proceed pursuant to these 1-hour ozone MVEBs that EPA determined were adequate.

On October 24, 2008, and almost five years after CARB submitted the 2003 State Strategy and the 2003 South Coast Plan to EPA, EPA finally issued a

---

[4] "Motor vehicle emissions budgets are the…motor vehicle-related portions of the projected emission inventory used to demonstrate…attainment…for a particular year specified in the SIP. The motor vehicle emissions budget establishes a cap on emissions which cannot be exceeded by predicted highway and transit vehicle emissions." 58 Fed. Reg. 62188, 62194 (Nov. 24, 1993).

proposed rule in the Federal Register on October 24, 2008. ER, at 008. However, the plans that were submitted in 2004 were dramatically different by the time EPA issued its proposed rule in 2008. Throughout 2008, CARB, the District, and the Southern California Association of Governments ("SCAG")[5] deleted a myriad of commitments in the plan, including commitments to reduce pollution from trucks, consumer products, and the transportation system. As an example, CARB requested that transportation measures aimed at reducing ozone pollution be removed from the plan. ER, at 296-97 Also, Elaine Chang, Deputy Executive Officer at the District filed a letter with EPA providing data showing that motor vehicle emissions in the South Coast were declining. ER, at 294-95. The purpose of this letter was to show EPA that the region did not need to adopt Transportation Control Measures pursuant to section 182(d)(1)(A) of the Act. 42 U.S.C. § 7511a(d)(1)(A). Effectively, CARB, SCAQMD, and SCAG removed the lion's share of pollution reduction measures in the 2003 plans. Because the 2003 South Coast Plan's computer modeling demonstrated a need for *more* commitments than the outdated 1997/1999 Plan and the regulators gutted the emission reductions, the

---

[5] The transportation plan and Transportation Improvement Program for a metropolitan area is developed by a regional transportation planning agency established under federal law known as the metropolitan planning organization ("MPO"). 23 U.S.C. § 134(b), 49 U.S.C. § 5303(c). In the South Coast nonattainment area the MPO is SCAG.

plans could no longer meet the 1-hour standard.  Accordingly, EPA disapproved the attainment demonstration.  ER, at 006.

Petitioners raised the following comments on deficiencies in the 2008 proposed rule—

1)     EPA's proposal was unlawful because it failed to require that CARB and SCAQMD develop a plan to demonstrate attainment of the 1-hour standard.

2)     The EPA cannot approve unenforceable commitments to adopt regulations into the SIP.

3)     EPA improperly failed to require Transportation Control Measures pursuant to section 182 of the Act and it is not excused from doing so based on the Chang letter.  42 U.S.C. § 7511a.

EPA rejected Petitioners' objections, and on March 10, 2009, EPA published its final rule in the federal register that closely mirrored the October 24, 2008 proposed rule.  ER, at 001.

## SUMMARY OF ARGUMENT

EPA's final rule approving in part and disapproving in part the 2003 State Strategy and 2003 South Coast Plan is contrary to the Act and is arbitrary and capricious under the Administrative Procedure Act ("APA").  Several critical violations of the Act interfere with the attainment of the 1-hour standard.

Specifically, EPA violates several provisions of the Act that require clean air plans to attain relevant standards, 42 U.S.C. §§ 7410(a)(2)(A), 7511a(c)(2)(A), include enforceable measures, 42 U.S.C. §§ 7410(a)(2)(A), 7502(c)(6), and include Transportation Control Measures when vehicle miles traveled increase in a region, 42 U.S.C. § 7511a(a)(2)(d)(1)(A).  The final rule is also arbitrary and capricious agency action. 5 U.S.C. § 706(2)(A).

First, EPA's disapproval of the attainment demonstration for the 2003 South Coast Plan without requiring CARB and the District to submit a revised plan that will attain the 1-hour standard violates the Act and the APA.  Attainment of federal clean air standards is a paramount goal of the Act.  Here, EPA found that the 2003 plans would fail to attain the health-based 1-hour standard.  Despite this finding, EPA failed to mandate submission of a plan that would get the job done.

Second, EPA's approval of an unenforceable commitment to adopt regulations to control pesticide air pollution violates the Act and the APA.  The Act requires that attainment plans include enforceable measures.  42 U.S.C. §§ 7410(a)(2)(A), 7502(c)(6).  This Court held that the Wells Memorandum was not a part of the State Implementation Plan. *Warmerdam*, 539 F.3d at 1069-72.  As a result of that decision, EPA approved a pesticide strategy whereby the decision to adopt regulations is discretionary, and in direct conflict with the Act.

Third, EPA violated the Act when it failed to require that the 2003 South Coast Plan include Transportation Control Measures, which are enforceable measures to reduce pollution from the South Coast's transportation system. 42 U.S.C. § 7511a(d)(1)(A). The plain language and legislative history of the Act, as well as the deliberate structure of the Act, demonstrate that Transportation Control Measures are required when vehicle miles traveled increase in a region. EPA diverges from the strict text of the statute and the legislative history and advances an approach that renders this provision of the Act superfluous. Because EPA's interpretation frustrates Congress's intent as manifested through the plain language of the statute, EPA's decision to not require Transportation Control Measures must be vacated.

Accordingly, Petitioners request that the Court vacate EPA's action on the 2003 plans and remand the matter to EPA.

## ARGUMENT

### I.    STANDARD OF REVIEW

This Court has jurisdiction to review EPA's approval of a SIP pursuant to section 307(b)(1) of the Act. 42 U.S.C. § 7607(b)(1); *see also Vigil v. Leavitt*, 381 F.3d 826, 833 (9th Cir. 2004). This section does not specify a standard of review, therefore the Court "appl[ies] the general standard of review for agency actions in the Administrative Procedure Act" and determines "whether EPA's actions were

'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Id*. (quoting 5 U.S.C. § 706(2)(A)).

EPA's action approving all or part of a SIP under the Act must be vacated and remanded when the approval is arbitrary, capricious, or otherwise not in accordance with law. 5 U.S.C. § 702. *Ober v. EPA*, 84 F.3d 304, 307 (9th Cir. 1996); *Hall v EPA*, 273 F.3d 1146, 1155 (9th Cir. 2001); *Safe Air For Everyone v. EPA*, 475 F.3d 1096, 1103 (9th Cir. 2007).

In evaluating Petitioner's claim that EPA's final rule warrants remand, the Court should follow the familiar *Chevron* standard, *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837, 842-43 (1984). Under *Chevron* step one, the Court must "give[] effect" to congressional intent discerned using "traditional tools of statutory construction." *Id*. at 843 n.9. When "the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id*. at 842-43. Where "the aim of Congress … is clear," the Court "do[es] not owe deference" to the agency. *Wilderness Society v. USFWS*, 353 F.3d 1051, 1062 (9th Cir. 2003) (citing *Chevron*, 467 U.S. at 842-43); *see also Ortiz v. Meissner*, 179 F.3d 718, 723 (9th Cir. 1999) (same). "In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *K-Mart Corp. v. Cartier Inc.*, 486 U.S. 281, 291

(1988). "[T]he statute's language, structure, subject matter, context, and history" are the "factors that typically help courts determine a statute's objective and thereby illuminate its text." *Padash*, 358 F.3d at 1170 (*quoting Almendarez-Torres v. U.S.*, 523 U.S. 224, 228 (1998)).

Where Congress has failed to make its intent clear, *Chevron* step two provides for judicial deference only to reasonable agency interpretations of the statute. *Chevron*, 467 U.S. at 845; *Rettig v. Pension Benefit Guar. Corp.*, 744 F.2d 133, 151 (D.C. Cir. 1984). Unless otherwise expressly indicated, references in this brief to "unlawful" agency action address both violation of Congressional intent under *Chevron* step one and unreasonable agency interpretation under step two.

Agency action is arbitrary and capricious if, *inter alia*, "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). An agency "must cogently explain why it has exercised its discretion in a given manner" or its actions will be deemed arbitrary. *Id.* at 48.

## II.     PETITIONERS HAVE STANDING.

Petitioners' members currently reside, work, recreate and/or travel in the South Coast, which has been designated as nonattainment for the pollutant ozone.

23

*See* Declarations filed herewith [Addendum ("AD), at 102-126].  Moreover,

Petitioners also have members injured by EPA's failure to disapprove an

unenforceable commitment to adopt regulations to control pesticide air pollution in

five regions of California.  On behalf of these members, Petitioner organizations

have standing to challenge EPA's final rule because their members are harmed by

current levels of pollution, and will continue to be harmed by hazardous pollution

levels because EPA's final rule unlawfully fails to require an attainment plan for

the 1-hour standard, Transportation Control Measures, and approves an

unenforceable commitments.

     The current and future harm to health suffered by Petitioners' members

meets all the recognized tests for standing.  This Court has construed the standing

requirement to ensure that parties seeking resolution of a dispute have a stake in

the outcome.

> The standing inquiry focuses upon "whether a party has a sufficient stake in
> an otherwise justiciable controversy to obtain judicial resolution of that
> controversy" *Sierra Club v. Morton,* 405 U.S. 727, 731 (1972), and serves to
> ensure that "legal questions presented to the court will be resolved...in a
> concrete factual context conducive to a realistic appreciation of the
> consequences of judicial action." *Valley Forge Christian Coil. v. Ams.
> United for Separation of Church & State, Inc.,* 454 U.S. 464, 472 (1982).

*Hall v. Norton,* 266 F.3d 969, 975 (9th Cir. 2001).

### A.    Petitioners Have Suffered, And Will Continue To Suffer An Injury-In-Fact.

The first test for determining Petitioners' stake is that "the [party] must have suffered an 'injury in fact'-an invasion of a legally-protected interest which is (a) concrete and particularized...and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992).  This Court's expansive case law supports the conclusion that the evidence of exposures exceeding the ozone NAAQS by Petitioners demonstrates that their members suffer "concrete," "particularized" and "imminent" injuries from air pollution that violates clean air standards.  The Act creates the legally protected interest in having air pollution concentrations reduced to comply with clean air standards.

Petitioners seeking review of EPA's unlawful approval of deficient SIPs have standing because they "will suffer injury if compelled to breathe air less pure than that mandated by the Clean Air Act." *NRDC v. EPA,* 507 F.2d 905, 910 (9th Cir. 1974) (citations omitted).  This holding has served as the unchallenged predicate for standing in numerous suits challenging EPA's unlawful approvals of deficient SIPs.  *Ober v. EPA,* 84 F.3d 304, 307 (9th Cir. *1996); Hall v. EPA,* 273 F.3d 1146, 1155 (9th Cir. 2001); *Abramowitz v. EPA,* 832 F.2d 1071 (9th Cir. 1987); *Delaney v. EPA,* 898 F.2d 687 (9th Cir. 1990), *cert.denied*, 111 S.Ct. 556 (1990).

Petitioners' factual predicate for injury here is identical since Petitioners' members are "compelled to breathe" levels of ozone that exceed the 1-hour and 8-hour standards promulgated to protect "public health."[6]  Petitioners' members aver that when they breathe the air on high pollution days it causes them various concrete and tangible forms of physical injury and discomfort, ranging from asthma attacks to general difficulty breathing and lung spasms. *See* Declarations of Elpe Villard, Lindon Schultz, Keith J. Gordon, Mary Duprey, Tom Frantz, Mary Haffner, and Teresa DeAnda (collectively "Petitioners' Members") filed herewith. Petitioners' members curtail physical exercise and outdoor activities due to high pollution concentrations, lessening their quality of life and impairing recreational opportunities. Petitioners' members are concerned by the smog they and their families see and are physically harmed by on a regular basis. *See* Declarations of Petitioners' Members filed herewith.

This Court's application of the Supreme Court's environmental standing decision in *Friends of the Earth v. Laidlaw,* 528 U.S. 167 (2000), found standing if an area would remain environmentally degraded. "Under *Laidlaw,* then, an individual can establish 'injury in fact' by showing a connection to the area of

---

[6] Clean Air Standards are set at levels "requisite to protect the public health." 42 U.S.C. §7409(b)(l); *Whitman* v. *American Trucking Associations,* 531 U.S. 457, 465 (2001). In 1997, EPA promulgated a new standard for ozone. 62 Fed. Reg. 38856 (Jul. 18, 1997).  The ozone NAAQS is exceeded at all reference monitors in the South Coast. 73 Fed. Reg. 63409 (Oct. 24, 2008).

concern sufficient to make credible the contention that the person's future life will be less enjoyable—that he or she really has or will suffer in his or her degree of aesthetic or recreational satisfaction—if the area in question *remains* or becomes environmentally degraded." *Ecological Rights Foundation v. Pacific Lumber Co.,* 230 F.3d 1141, 1149 (9th Cir. 2000) (emphasis added); *see also Sierra Club v. Morton*, 405 U.S. 727, 734-736 (1972). In the present situation, EPA disapproved the attainment demonstration for the South Coast, which means that based on the reductions in pollution needed to attain the 1-hour ozone standard, the region will not meet the standard. Also, EPA did not dispute the evidence presented by Petitioner NRDC of violations of the 1-hour standard. ER, at 094-95, 100, 104.

Standing does not require that the action being challenged make the harm worse. It is enough that environmental degradation has already occurred, and that the action being challenged would not give effect to the statutory remedy intended to reduce the adverse effects of such degradation on Petitioners' future lives. In this case, residents in the South Coast, San Joaquin Valley, and Ventura do not breathe air that meets the 1-hour ozone standard by the relevant deadline.

This Court subsequently re-affirmed that merely the anticipated exposure to the future adverse effects of air pollution is enough to establish standing. *Hall* v. *Norton,* 266 F.3d at 976 ("Hall in averring that his respiratory discomfort will be aggravated by emissions from developments on former BLM lands, asserts an

injury that is sufficiently concrete and particularized to satisfy standing."). "It follows that evidence of a credible threat to the plaintiff's physical well-being from airborne pollutants falls well within the range of injuries to cognizable interests that may confer standing." *Id.* If "a credible threat to [petitioner's] physical well-being from airborne pollutants falls well within the range of injuries to cognizable interests that may confer standing," *Id; see also City of Los Angeles v. Lyons,* 461 U.S. 95, 107 n.8 (1983), then Petitioners' evidence showing that their members' well-being is now adversely affected by ozone, and exposure to such pollutant is likely to continue as a result of the challenged agency action, constitutes a much more concrete interest.

Petitioners' stake is also "particularized" within the meaning of *Lujan,* 504 U.S. at 561, n.1, ("particularized" means that "the injury must affect the plaintiff in a personal and individual way"), because each of Petitioners' members experience a unique personal harm from exposure to ozone. *See* Declarations of Petitioners' Members. That the injury caused by air pollution, may be shared by millions of other people in the air basin, does not deprive each injured person of a particularized injury. *See Sierra Club v. Morton*, 405 U.S. 727, 734 (1972) ("The fact that particular environmental interests are shared by the many rather than the few does not make them less deserving of legal protection through the judicial process."); *US v. SCRAP,* 412 U.S. 669, 687 (1973) ("Standing is not to be denied

28

simply because many people suffer the same injury."); *accord Warth v. Seldin,* 422 U.S. 490, 501 (1975).

### B.  Petitioners Satisfy the Causation Test.

The causation test requires that "the injury is fairly traceable to the challenged action of the defendant." *Bernhardt v. County of Los Angeles, 279* F.3d 862, 868 (9th Cir. 2002) (quoting *Laidlaw).*  In cases challenging an agency action that fails to fully implement remedial statutes, this Court has not required a showing that the agency action causes the environmental harm that is the source of a party's injury.  Rather causation arises from an agency's failure to implement the required remedies.  For example, in *Biodiversity Legal Foundation v. Badgley,* 309 F.3d 1166, 1172 (9th Cir. 2002), the Court implicitly found causation sufficient for standing based on an agency's failure to implement the remedial steps required by the Endangered Species Act to protect threatened species because the agency's failure "will result in continued threats to their existence."

Here, Petitioners' injuries from air pollution may be traced to three effects of EPA's decision: 1) excess ozone that will remain in the air because the EPA final rule fails to require that CARB and the District develop a plan to show attainment of the 1-hour ozone standard; 2) excess ozone that will remain from failure to require transportation measures aimed at reducing pollution; and 3) the excess emissions allowed from failure to control pesticides, emissions that would

29

otherwise not occur.  Further, Petitioners are further injured due to EPA's approval of unenforceable commitments in the State Strategy, which could preclude Petitioners from seeking redress if these measures are not implemented.

Petitioners will likely suffer greater future harm because ozone levels will be above the 1-hour standard and remain in the air for a longer duration than they would be if EPA had not acted unlawfully.  Had the rule followed Congress' mandates, there would necessarily be a viable, enforceable clean air plan in place.

EPA's approval of these inadequate provisions also deprives Petitioners of the benefits that flow from the regulatory requirements that would otherwise govern a fully adequate attainment plan.  For example, section 182 of the Act requires that nonattainment areas provide additional transportation improvements (e.g. improvements to public transit, addition of bicycle lanes, etc.) that are geared towards constraining ozone pollution.  42 U.S.C. § 7511a(d)(1)(A).  Since EPA has not required CARB to submit these measures, EPA deprives Petitioners' members of the benefits associated with these transportation improvements.  Moreover, EPA's unlawful approval of inadequate and unenforceable plans deprives petitioners of significant air quality improvements through weakened enforcement opportunities for failures to comply with the EPA-approved SIP measures.  This harm is directly traceable to EPA's action.

### C.    Claims Will Be Redressed By The Relief Sought.

Petitioners seek to vacate EPA's final rule based on the following deficiencies: 1) failure to require that CARB and the SCAQMD develop a plan to show attainment of the 1-hour standard; 2) failure to require Transportation Control Measures pursuant to 42 U.S.C. § 7511a; 3) approval of unenforceable commitments in the SIP.  By a redress of these deficiencies—creating a clear, enforceable plan to meet the clean air standards—ozone levels in the South Coast will significantly improve over time.  Reduction in ozone levels will alleviate Petitioners' harm.  This result satisfies the test for redressability. *See Ecological Rights Foundation v. Pacific Lumber Co.,* 230 F.3d 1141, 1152 n.12 (9th Cir. 2000) (Plaintiffs can satisfy the "redressability" factor by showing that enforcement of the statutorily required control measures are likely to reduce the risk of the pollution causing their injury); *Swan v. Clinton,* 100 F.3d 973, 980 (D.C. Cir. 1996)(holding that partial relief is sufficient for redressability).

### III.   THE EPA'S FAILURE TO REQUIRE A PLAN THAT MEETS ATTAINMENT OF THE 1-HOUR STANDARD VIOLATES THE ACT.

Attainment of clean air standards is the primary and ultimate goal of Congress' air quality planning process.  Accordingly, EPA violated the Act by failing to compel California to submit a plan that would attain the 1-hour standard. *See* 42 U.S.C. § 7410(a)(2)(A)(a plan should "include enforceable emission

limitations and other control measures, means or techniques…, as well as schedules and timetables for compliance, as may be necessary or appropriate to meet the applicable requirements of this chapter"); 42 U.S.C. § 7511a(c)(2)(A)("A demonstration that the plan, as revised, will provide for *attainment* of the ozone [NAAQS] by the applicable attainment date.")(emphasis added).

This Court has consistently held that EPA may not approve an attainment plan if the plan fails to require emissions reductions sufficient to attain the clean air standard. *Delaney v. EPA*, 898 F.2d 998 (9th Cir.), *cert.denied*, 111 S.Ct. 556 (1990); *Arizona v. Thomas*, 294 F.2d 834 (9th Cir. 1987); *Hall*, 273 F.3d at 1155. Concluding that the basic criteria for EPA's approval of SIP revisions adopted by the Supreme Court in 1975 continue to apply, this Court reiterated that "[t]he objective of the EPA's analysis is to determine whether 'the ultimate effect of a State's choice of emission limitations is compliance with [NAAQS].'" *Hall*, 273 F.3d at 1159 (quoting *Train v NRDC*, 421 U.S. 60 (1975). "EPA must determine the extent of pollution reductions that are required and determine whether the emissions reductions effected by the proposed revisions will be adequate to the task." *Id.* "The EPA must be able to determine that, with the revisions in place, the whole 'plan as ... revised' can meet the Act's attainment requirements." *Id.*

In the instant case, EPA argues that its duty to require an attainment plan somehow ceased in 2000 when it approved the 1997/1999 Plan.  ER, at 003-04.

EPA makes this argument despite the fact that CARB and SCAQMD acknowledged that based on new information (e.g. an updated emissions inventory), the 1997/1999 Plan was inadequate to meet the 1-hour standard by 2010. ER, at 113, 249. EPA also argues that since it determined the 1997/1999 Plan attained the 1-hour standard based on the information presented to the agency in 1997 and 1999, the 2003 South Coast Plan does not need to demonstrate attainment. ER, at 003. EPA argues this is the case even if it is shown that the 1997/1999 Plan is not a viable path to attain the 1-hour standard by 2010. EPA further argues that the 2003 South Coast Plan was a "discretionary" plan, so EPA does not need to ensure the plan attains the 1-hour standard. ER, at 003-04. We will address these arguments below.

Congress spoke directly to the issue here, mandating that EPA shall impose sanctions and promulgate a Federal Implementation Plan if California fails to submit a plan that demonstrates attainment of the 1-hour standard. EPA's decision to disapprove the attainment demonstration and do nothing more is arbitrary and capricious.

### A. EPA Violated its Duty to Ensure the 2003 South Coast Plan Demonstrates Attainment.

EPA found that the 2003 State Strategy and the 2003 South Coast Plan fail to demonstrate sufficient reductions of ozone-forming pollution to meet the 1-hour standard by 2010. Despite this fundamental deficiency in the plans, EPA's final

rule does nothing to compel CARB or the District to submit a plan which *does*

reduce emissions to attain the standard.

Congress spoke to no exception when it mandated that attainment plans shall

contain emission limitations and other control measures to provide for attainment

of clean air standards by the applicable deadline.  42 U.S.C. §§ 7410(a)(2)(A),

7502(c)(6) ("plan provisions shall include enforceable emission limitations, and

such other control measures . . . to provide for attainment . . . by the applicable

attainment date); 42 U.S.C. § 7511a(d)(1)(A)(statutory requirement that SIP

"provide adequate enforceable control measures to allow total area emissions to

comply with [Reasonable Further Progress] and attainment requirements).  EPA

ignores this plain language in the Act when it contends that it need do nothing after

finding that the 2003 South Coast Plan does not include sufficient control measures

to demonstrate attainment.  To the contrary, EPA has the affirmative duty under

sections 110(c) and 179 of the Act to take over air quality planning by

promulgating a Federal Implementation Plan and withholding federal highway

funding unless and until California corrects the deficiency that EPA has found.

*See* 42 U.S.C. §§ 7410(c)(1)(B) ("The Administrator shall promulgate a Federal

implementation plan at any time within 2 years after the Administrator . . .

disapproves a State implementation plan submission in whole or in part");

7509(a)(2) (sanctions required for disapproval of plan submission unless

corrected).

> **B.**    **EPA's Failure to Require a New Attainment Demonstration is
> Arbitrary and Capricious in Light of Significant New Information
> that Rendered the Outdated 1997/1999 Plan Ineffective.**

After sitting on the 2003 South Coast Plan for almost five years, EPA

decided in 2008 it could disapprove the attainment demonstration and not require a

plan that would attain the 1-hour standard.  ER, at 006.  This approach ignores

significant relevant facts about the need for the 2003 South Coast Plan.  In

reference to why the agencies developed and submitted the plan to EPA, the

District stated—

> The California Clean Air Act requires a non-attainment area to update its
> AQMP triennially to incorporate the most recent available technical
> information. In addition, U.S. EPA requires that transportation conformity
> budgets be established based on the most recent planning assumptions (i.e.,
> within the last 5 years). Both the 1997 SIP and the 1999 amendments were
> based on demographic forecasts of the mid-1990's using 1993 as the base
> year. Since then, updated demographic data has become available, new air
> quality episodes have been identified, and the science for estimating motor
> vehicle emissions and air quality modeling techniques for ozone and PM10
> have improved. Therefore, a plan update is necessary to ensure continued
> progress toward attainment and to avoid a transportation conformity lapse
> and associated federal funding losses.

ER, at 113.  Here, EPA argues that it can ignore the updated demographic data,

new air quality data, and information on estimating motor vehicle emissions that

rendered the 1997/1999 Plan ineffectual.  This "fail[ure] to consider an important

aspect of the problem," *Motor Vehicle Mfrs. Ass'n of the U.S., Inc.*, 463 U.S. at 43,

35

renders the agency's action arbitrary and capricious.  Thus, even if this plan is a

discretionary plan as EPA argues, the decision not to require an updated attainment

plan is arbitrary.  Based on the District's and CARB explanation, we now know

that the assumptions underlying the 1997/1999 Plan are no longer valid.  ER, at

119. As CARB further noted there was a "need for much greater emission

reductions" to attain the 1-hour standard than what was provided in the 1997/1999

South Coast Plan.  ER, at 119.  As a result of this new information, we know that

the old 1997/1999 Plan is not going to work as envisioned.  In fact, EPA does not

argue in either the proposed or final rule that the 1997/1999 Plan will be effective

in attaining the standards.  It is absurd for EPA to pretend that nothing has changed

and that EPA can reasonably stand behind the original approval of the 1997/1999

Plan.

**C.    The 2003 South Coast Plan is Not Discretionary, and EPA Must Require an Updated Plan Because the Prior Plan Is Patently Out of Date.**

EPA erred in determining that CARB and the District were not required to

submit an ozone plan in 2003.  EPA does not "cogently explain," *Id.* at 48, why it

can ignore key provisions of the Act.  The conformity provisions of the Act tie

transportation planning and federal funding to achieving NAAQS by way of the

Motor Vehicle Emissions Budgets ("MVEBs") because the NAAQS cannot be

attained without limiting motor vehicle emissions.  The Act requires conformity to

"be based on the most recent estimates of emissions, and such estimates shall be determined from the most recent population, employment, travel, and congestion estimates." 42 U.S.C. § 7506(c)(1).  The conformity requirements ensure that the region's transportation plan and program will achieve the emissions reductions needed to meet clean air standards.  The need for this tie plays out most persuasively in areas like Los Angeles where motor vehicles play such a large role in contributing to violations of NAAQS. ER, at 166 (constituting 89% of the NOx and 54% of the VOC emissions in 2010).

Under the Act, EPA can make an initial adequacy determination before it fully reviews the SIP submission.  40 C.F.R. §93.118(e)(4).  This adequacy determination can take place soon after a plan is submitted to EPA and allows the region's transportation plan and the projects contained within that plan to pass the conformity hurdle pending EPA's full review of the entire plan.  In the instant case, more than five years elapsed between the adequacy determination and EPA's final decision that the MVEBs are inadequate to achieve the 1-hour standard.  In its decision vacating the portion of EPA's 1997 conformity rule that allow submitted MVEBs to take effect without any review by EPA, the D.C. Circuit interpreted the Act to bar use of a MVEB for conformity purposes if the SIP from which it came failed to require enough emission reductions to provide for attainment. *Environmental Defense Fund*, 167 F.3d 641, 650 (D.C. Cir. 1999).  This is

perfectly sensible because emission budgets that do not get a region to attainment of the ozone standard are ineffectual in meeting the goals of the Act.

For the 2003 South Coast Plan, the EPA made its adequacy determination for the MVEBs shortly after the plan was submitted in 2004. EPA's adequacy determination states—

> The plan provide for attainment or maintenance (as appropriate) of the relevant ambient air quality standard. We have preliminarily determined that the South Coast SIP submittal provides for progress and attainment of the 1-hour ozone, PM10, and CO NAAQS, and maintenance of the nitrogen dioxide (NO2) NAAQS, and that the budgets associated with the plans are consistent with the plan and, therefore, can be found adequate.

69 Fed. Reg. 15325 (Mar. 25, 2004). Five years after EPA determined the budgets were adequate and numerous projects proceeded, EPA is now arguing that it does not need to find that the plan attains clean air standards. Because the 2003 Plans were needed "to avoid a transportation conformity lapse and associated federal funding losses", ER, at 113, EPA's stance of ignoring that the South Coast Plan fulfilled this role, is arbitrary and capricious. This allowed years of transportation projects to proceed in the South Coast without the associated emissions benefits from control measures aimed at reducing that pollution.[7]

---

[7] The Transportation Improvement Program is a prioritized listing of transportation projects eligible for federal funding over a four year period. 23 U.S.C. § 134(g),(h); 49 U.S.C. §§ 5303(f), 5304(b); 23 C.F.R. § 450.218. Thus, the 2003 ozone budgets that were later deemed inadequate allowed a full four-year cycle of projects to be completed without being designed to achieve the emission levels needed for attainment in the nation's most ozone polluted region.

Under EPA's interpretation, a state could submit new MVEBs as part of an attainment plan, receive an adequacy determination, and then remove its commitments to adopt controls on pollution before EPA acts on the final plan. This offers residents of polluted areas an unfavorable tradeoff. EPA could effectively open up the floodgates for transportation projects and plans and never require emissions reductions. Because EPA's actions here do not comport with the Act, and it failed to "cogently" explain why it does not need to require an attainment demonstration, the agency has acted arbitrarily and capriciously.

## IV. EPA'S RE-APPROVAL OF THE PESTICIDE ELEMENT'S DISCRETIONARY COMMITMENT TO ADOPT REGULATIONS VIOLATES THE ACT.

The 2003 State Strategy re-commits to implement the Pesticide Element, California's strategy for reducing smog-forming VOC emissions from structural and agricultural pesticides. Originally submitted by CARB as a component of the 1994 Ozone SIP, EPA approved the Pesticide Element in 1997. EPA has interpreted the Pesticide Element to include a commitment to reduce VOC emissions by 20 percent from 1990 levels by 2005 in five ozone nonattainment areas, to achieve a tonnage reduction in each area's attainment year, and a commitment to adopt any regulations necessary to achieve this reduction by June 15, 1997.

The Act requires that attainment plans contain enforceable emissions limitations and other control measures.  The Ninth Circuit's *Warmerdam* decision held that the Pesticide Element's commitment to adopt regulations in the Wells Memorandum was not approved as a part of the State Implementation Plan, which deprived the Court of jurisdiction and made the commitment discretionary and not enforceable by the public.  After this Court's ruling, EPA should have disapproved the Pesticide Element's commitment to adopt regulations.  EPA's approval of the Pesticide Element of the 2003 State Strategy without an enforceable commitment to adopt regulations violates the Act.

### A.    Commitments to Adopt Regulations Must be Enforceable.

The Act requires that emission limitations and control measures included in an attainment plan be enforceable.  42 U.S.C. § 7410(a)(2)(A);[8] 42 U.S.C. § 7502(c)(6) (enforceable emissions limitations required for nonattainment areas).  The Act defines an emission limitation as "any condition or requirement under an applicable implementation plan."  42 U.S.C. § 7604(a)(1).  Plans must include programs "to provide for the enforcement of" emission limitation measures ("the measures described in subparagraph (A)").  42 U.S.C. § 7410(a)(2)(C).  EPA may only approve plans that satisfy the Act's requirements.  42 U.S.C. § 7410(k)(3).

---

[8] State Implementation Plans shall contain "*enforceable* emissions limitations and other control measures, means, or techniques . . . as well as schedules and timetables for compliance."  42 U.S.C. § 7410(a)(2)(A) (emphasis added).

Upon approval by EPA, an attainment plan becomes federal law as part of the EPA-approved State Implementation Plan.  *Safe Air for Everyone v. EPA,* 475 F.3d 1096 (9th Cir. 2007); *Bayview Hunters Point Cmty. Advocates v. Metro. Transp. Comm'n,* 366 F.3d 692, 695 (9th Cir. 2004).  EPA and private citizens may sue to enforce the strategies in the EPA-approved State Implementation Plan but may only "'enforce specific measures, strategies, or commitments designed to ensure compliance with the NAAQS.'" *Bayview*, 366 F.3d at 695, 703, quoting *Conservation Law Found. Inc. v. Busey,* 79 F.3d 1250, 1258 (1st Cir. 1996); *see also* 42 U.S.C. § 7604(a).

EPA has historically interpreted the Act "to allow states to submit enforceable commitments to adopt rules in the future."  62 Fed. Reg. at 1156. States may submit attainment demonstrations that rely in part on commitments to adopt measures and such commitments must be enforceable.  *See* 73 Fed. Reg. 41277, 41281 (Jul. 18, 2008),  (committal measures approvable only if enforceable).  According to EPA, an attainment plan commitment approved "under section 110(k)(3) allows for enforcement action" either by the Agency, "through a finding of failure to implement if the state does not meet its enforceable commitment," or by the public.  62 Fed. Reg at 1156.  "[C]ourts have found these commitments to be enforceable by the public under the citizen suit provisions of the Act."  *Id*.

41

Unless commitments are required to be enforceable, the Supreme Court has observed that "local and regional agencies could define their commitments as vaguely as possible in order to avoid constraint and reform, and then later redefine strictures away if faced with unpopular tradeoffs." *General Motors Corp. v. United States,* 496 U.S. 530, 533 (1990).

**B.    The Pesticide Element's Commitment to Adopt Regulations is Unenforceable.**

**1.    EPA has interpreted what is necessary to make the Pesticide Element enforceable.**

*a. 1994 Ozone SIP approval*

As first submitted to EPA in 1994, the Pesticide Element did not meet the requirements of the Act, primarily because it failed to include specific dates for the adoption and implementation of any regulations necessary to achieve the required reductions.[9] ER, at 047-48, 049-50, 051-52.   EPA did not propose approval of the Pesticide Element until CARB submitted the Wells Memorandum, which committed to adopting any regulations necessary to reduce VOCs "by specific percentages of the 1990 base year emissions, by specific years, and in specific

---

[9]  EPA sought, *inter alia*, (1) a "commitment to limit VOC emissions from pesticides to specific percentages of the 1990 base year emissions by specific years in specific non attainment areas *regardless of future growth in emissions that might occur"* (emphasis added) (E.R. at C-2-b p.1); (2) a commitment to implement regulations by a certain date; (3) a commitment to adopt any necessary regulations by a specific month prior to the implementation date.

nonattainment areas." ER, at 053-54. Although CARB later requested in the

Howekamp Letter that these interim goals and standards be deleted, EPA

reaffirmed its intent to approve an enforceable Pesticide Element in the Final Rule

by quoting the Wells memorandum. 62. Fed. Reg. at 1150, 1169-70.

    In the 1994 Ozone SIP final rulemaking, EPA articulated its position that the

commitment to adopt regulations included in the Pesticide Element 1994 Ozone

SIP is an enforceable commitment. 62 Fed. Reg. at 1170. EPA approved the

entire SIP under section 110(k)(3). *Id*.

> EPA believes that the SIP commitments approved today are sufficiently
> specific to be enforceable by the Agency or the public. For example, the
> control measure commitments are for particular agencies to adopt and
> implement controls by definite dates to achieve precise emission reduction
> from identified source categories for each milestone year through
> attainment.

*Id*. at 1156.

### b. 2008 Ventura SIP Revision.

    In July 2008, EPA interpreted the Pesticide Element's commitment to adopt

regulations in the final rule "Revisions to the California State Implementation Plan;

Pesticide Element; Ventura County." 73 Fed. Reg. 41277 (Jul. 18, 2008). EPA

again referred to the June 15, 1997 deadline to adopt any regulations necessary. *Id*.

EPA explained the essential characteristics of enforceable SIP commitments as

applied to the commitments in the Pesticide Element:

> Our interpretation of the original Pesticide Element commitment as having
> both a tonnage reduction commitment in addition to the percent reduction

43

> commitment rests on general and specific grounds. First, EPA has
> traditionally found committal measures, such as the commitment to reduce
> VOC emissions in the Pesticide Element of the 1994 Ozone SIP, to be
> enforceable, and thus approvable, *only if* such measures identify the
> responsible party, *adoption dates for rules*, implementation dates, and
> emissions reductions in terms of emissions rates (such as tons per day) equal
> to the credit taken in the RFP or attainment plan for the committal measure.

*Id*. at 41281(emphasis added).  EPA further stated that "[e]ach specific element of

a committal measure, once the measure is approved by EPA, is considered to be

enforceable."  *Id*.  To be enforceable, each element of a committal measure must

be clear, specific, and measurable.  EPA's use of "only if," denotes that the

requirements that follow are necessary conditions for enforceability and therefore

approvability of a committal measure.  EPA further states that bare commitments

to adopt measures are not enforceable.

> The tonnage specification provides the essential link between the committal
> measure and the RFP or attainment demonstration.  [. . .] In this case, the
> tonnage commitment (for 2005) links the original Pesticide Element
> commitment to the approved attainment demonstration for Ventura County.
> [. . .]  Thus, we believe that EPA would not have found the original Pesticide
> Element commitment for Ventura approvable *unless* the measure included
> the 2.37 tons per day reduction in pesticide VOC emissions in 2005 that was
> credited to the measure in the 1994 Ozone SIP.

73 Fed. Reg. at 41281 (emphasis added).  Measurable, clear, specific standards

that can be enforced by the Agency or the public are necessary before EPA may

approve a committal measure.

### c. *The 2003 State Strategy.*

The 2003 State Strategy describes the existing pesticide strategy in the 1994

Ozone SIP:

> As described in the 1994 SIP and U.S. EPA's notice approving that plan,
> DPR committed to reduce VOC emissions from pesticides through voluntary
> measures, with a regulatory backstop.  Specifically, DPR committed to adopt
> and submit to U.S. EPA by June 15, 1997, any regulations necessary to
> reduce VOC emissions from agricultural and commercial structural
> pesticides by specific percentages of the 1990 base year emissions, by
> specific years, and in specific nonattainment areas.  For the South Coast, the
> commitment is to reduce VOC emissions from pesticides to a level 20
> percent below 1990 base year emissions by the attainment year.

ER, at 256.  Again, this commitment uses the language of the Wells Memorandum,

and its key date by which DPR would adopt necessary regulations.  EPA approved

this commitment with no further discussion about whether it is enforceable.

### 2.    The Ninth Circuit Held in *Warmerdam* that the Pesticide Element's Commitment to Adopt Regulation is Unenforceable.

On August 20, 2008, one month after EPA explained why it interpreted the

Pesticide Strategy to contain enforceable commitments to adopt regulations, the

Ninth Circuit held that the Wells Memorandum, was not part of the State

Implementation Plan and the Court lacked jurisdiction over the plaintiff's citizen

suit to enforce the Wells Memorandum.  *Warmerdam*, 539 F.3d at 1069-1072.  The

Ninth Circuit stated:

> Because we conclude that the schedule and interim standards of the Wells
> Memorandum are not part of the SIP, California would not have been in

45

violation of the SIP even if it had made no decision about the need for further regulations.  And significantly, any such decision would have been *discretionary* by the language of the SIP ("a decision whether additional regulatory measures to ensure that reductions in pesticidal VOC emissions are achieved will be made by 1997").

*Id*. at 1069 (emphasis added).  The Ninth Circuit further observed that the Howekamp Letter, not the Wells Memorandum, was "the last word in the saga of the SIP."  *Id*. at 1071.

Simply put, because the SIP does not include the Wells Memorandum, the Pesticide Element does not contain an enforceable commitment to adopt regulations.  The Strategy grants DPR discretion to determine how to attain the 20 percent emissions reduction committed to in the Howekamp letter.

**C.    EPA's Re-Approval of the Pesticide Element Violates the Act.**

On March 10, 2009, seven months after the Ninth Circuit's *Warmderdam* decision, twelve years after the June 15, 1997 deadline to adopt regulations in the Wells Memorandum, and four years after the deadline to achieve a 20 percent reduction in the Howekamp Letter, EPA approved the 2003 State Strategy, even though the commitment to adopt pesticide regulations was unenforceable under *Warmerdam*.  *See* ER, at 001.  Thus, EPA violated the Act by approving an unenforceable committal measure.  42 U.S.C. § 7410(a)(2)(A); 42 U.S.C. § 7502(c)(6).

46

EPA's approval of an unenforceable strategy directly conflicts with the plain language of the Act and frustrates Congress' fundamental purpose in requiring meaningful plans to deliver healthy air.  Allowing the California DPR total discretion to determine whether or not it will adopt regulations endows DPR with a peculiar authority to implement the dictates of the Act as DPR sees fit.  The Supreme Court in *General Motors* cautioned against such usurpation of authority because a discretionary commitment is not only inherently unenforceable, it also contravenes the Act.  *See* 496 U.S. at 533; 42 U.S.C. §§ 7410(a)(2)(A), 7502(c)(6).

Thus, because the Pesticide Element lacks an enforceable commitment to adopt regulations, EPA's approval of the strategy violates the Act.  *See* 42 U.S.C. §§ 7410(a)(2)(A), 7502(c)(6).  Accordingly, the Court should vacate EPA's approval of the 2003 State Strategy.

## V.   EPA UNLAWFULLY APPROVED CARB'S SIP REVISION IN VIOLATION OF CLEAN AIR ACT § 182(D)(1)(A), WHICH REQUIRES SEVERE AND EXTREME NONATTAINMENT AREAS TO ADOPT ENFORCEABLE TRANSPORTATION CONTROL MEASURES.

The Act requires all areas of the country to meet clean air standards, 42 U.S.C. § 7410(a), including the 1-hour standard.  *SCAQMD v. EPA*, 472 F.3d 882, 904 (D.C. Cir. 2006)("EPA can point to no aspect of Congress's approach that suggest that [1-hour] ozone levels specifically addressed in statute are allowed to deteriorate.").  States with ozone nonattainment areas must adopt additional

pollution control measures and incorporate them into their SIPs, with the strictest additional controls mandated for those areas with the highest and unhealthiest levels of air pollution. *Id*. at §§ 7501-7515. The South Coast Air Basin has been classified as an "Extreme" nonattainment area for ozone, ER, at 115, meaning CARB must therefore revise California's SIP and implement the additional ozone control requirements set forth in Title I, Part D of the Act. *See* 42 U.S.C. § 7511a(e).

Among the additional provisions applicable to an extreme nonattainment area for ozone like the South Coast is section 182(d)(1)(A), which declares that each state in which a severe or extreme[10] area is located "*shall … submit a revision that* identifies and *adopts specific enforceable transportation control strategies and transportation control measures to offset any growth in emissions from growth in vehicle miles traveled* or numbers of vehicle trips in such area …" 42 U.S.C. § 7511a(d)(1)(A) (emphasis added). Stated more simply, a severe or extreme nonattainment area for ozone *must* adopt enforceable transportation control

---

[10] Section 182 classifies ozone nonattainment areas as "marginal", "moderate", "serious", "severe", or "extreme". 42 U.S.C. § 7511a. Extreme nonattainment areas must meet the most strenuous requirements applicable to severe nonattainment areas as well as the additional requirements specific to extreme areas. 42 U.S.C. 7511a(e) ("Each State in which all or part of an Extreme Area is located shall, with respect to the Extreme Area, make the submissions described under subsection (d) of this section (relating to Severe Areas), and shall also submit the revisions to the applicable implementation plan (including the plan items) described under this subsection.").

48

measures ("TCMs")[11] that offset the additional emissions resulting from an increase in vehicle miles traveled ("VMT"). The House Committee Report that accompanied adoption of section 182 during the 1990 Clean Air Act Amendments explains how to calculate emissions increases attributed to VMT, stating: "The baseline for determining whether there has been growth in emissions due to increased VMT is the level of vehicle emissions that would occur if VMT held constant in the area." 2 S. Comm. on Environment & Public Works, 103rd Cong., A Legislative History of the Clean Air Act Amendments of 1990 (Comm. Print 1993) ("Legis. Hist.") at 3266 (H.R. Rep. No. 101–490 (1990))[AD, at 81].

There is no dispute that VMT has increased within the South Coast Air Basin and that vehicle emissions are higher than they would be if VMT held constant in the area. *See* ER, at 161-62. Nonetheless, CARB and the District have failed to adopt TCMs in the 2003 Plan and EPA approved the plans despite this failure. ER, at 001. Because "Congress has directly spoken to the … issue," *Chevron*, 467 U.S. at 842-43, under the plain language of section 182(d)(1)(A) CARB's SIP is inadequate as a matter of law and EPA's approval of it is equally unlawful. *See also Maislin Indus. v. Primary Steel, Inc.*, 497 U.S. 116, 134-35

---

[11] TCMs are "strategies that adjust trip patterns or otherwise modify vehicle use in ways that reduce air pollutant emissions." ER, at 203-231. Examples of TCMs include improving public transit; developing and encouraging use of high occupancy vehicle (HOV) lanes; promoting bicycling and walking; facilitating van-pools and smart shuttles; and managing congestion to reduce emissions from idling vehicles. *See generally* 42 U.S.C. § 7408(f); *see also* ER, at 173-78.

(1999) (an agency "does not have the power to adopt a policy that directly conflicts with its governing statute").

In the Final Rule, EPA attempts to justify its failure to require CARB to adopt TCMs by offering the agency's own "alternative" interpretation of section 182(d)(1)(A). ER, at 004. Whereas the plain language of section 182 specifically ties a state's obligation to adopt TCMs to "growth in emissions from growth in vehicle miles traveled," 42 U.S.C. § 7511a(d)(1)(A), EPA interprets section 182 to mean a state may lump higher emissions from increased VMT together with lower emissions related to other variables—including tailpipe controls and alternative fuels—and forego TCMs unless net emissions have increased across the area's entire motor vehicle fleet. ER, at 004-05.[12] EPA candidly acknowledges that the agency's lenient reading of the statute cannot be reconciled with the explanation of section 182(d)(1)(A) provided in the House Committee Report. *Id.* at 04. Despite this clear evidence of Congressional intent, EPA insists in the Final Rule that section 182 is susceptible to "two alternative interpretations" and that the agency's reading—intended to avoid overburdening severe nonattainment areas with adoption of "severe restrictions"—is "most reasonable." *Id.* EPA does not

---

[12] According to EPA, "CAA section 182(d)(1)(A) requires states to adopt sufficient TCMs so that projected motor vehicle emissions, taking into account motor-vehicle-related emissions controls and growth in VMT, will never be higher during the ozone season in one year than during the ozone season in the year before." ER, at 005.

explicitly cite *Chevron* in the Final Rule but the agency's position is obviously cloaked in the familiar standard:  the agency asserts that section 182(d)(1)(A) is ambiguous (*Chevron* Step 1) and claims discretion to interpret the statutory in a manner it deems reasonable (per *Chevron* Step 2).

EPA's defense of its failure to require CARB to adopt TCMs despite the growth of VMT in South Coast is unlawful because the plain language of section 182(d)(1)(A) speaks directly to the issue.  The operative clause of Section 182(d)(1)(A) states in simple terms that a severe ozone nonattainment area "shall" adopt TCMs "to offset any growth in emissions from growth in vehicle miles traveled."  42 U.S.C. § 7511a(d)(1)(A).  The key clause is specific about "emissions from growth in vehicle miles traveled" and nothing in the text suggests that "growth" in such emissions should be measured against any baseline other than existing emissions from VMT.  EPA employs a baseline "taking into account motor-vehicle-related emissions controls *and* growth in VMT," ER, at 005 (emphasis added), diluting VMT growth with considerations that are not mentioned in the text.  To overcome a statute's literal meaning EPA "must show either that, as a matter of historical fact, Congress did not mean what it appears to have said, or that, as a matter of logic and statutory structure, [Congress] almost surely could not have meant it."  *New York v. EPA*, 443 F.3d 880, 889 (D.C. Cir. 2006) (quoting *Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1089 (D.C. Cir. 1996)).

EPA has made no showing that Congress intended anything other than for all severe and extreme ozone nonattainment areas to adopt TCMs to offset increased emissions associate with increased VMT and "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43.

Significantly, EPA's assertion that section 182 is "susceptib[le]" to "two alternative interpretations" does not make the statute's language ambiguous. As this Court has explained previously, "Ambiguity for *Chevron* purposes … 'is a creature not of definitional possibilities, but of statutory context.'" *Gallarde v. INS*, 486 F.3d 1136, 1141 (9th Cir. 2007) (*quoting Brown v. Gardner*, 513 U.S. 115, 118 (1994)). "In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *K-Mart Corp. v. Cartier Inc.*, 486 U.S. 281, 291 (1988).

When viewed in context, Congress's intent to require severe and extreme ozone nonattainment areas to adopt enforceable TCMs to offset any additional emissions resulting from growth in VMT—independent of other trends in overall vehicle emissions—becomes plain. The specific clause in section 182(d)(1)(A) requiring adoption of TCMs to offset growth in emissions from VMT is part of a longer sentence that includes a second, more general mandate for states "to attain

reduction in motor vehicle emissions."  The key sentence in section 182(d)(1)(A),

in its entirety, states:

> (A) Within 2 years after November 15, 1990, the State shall submit a revision that identifies and adopts specific enforceable transportation control strategies and transportation control measures to offset any growth in emissions from growth in vehicle miles traveled or numbers of vehicle trips in such area and to attain reduction in motor vehicle emissions as necessary, in combination with other emission reduction requirements of this subpart, to comply with the requirements of subsection (b)(2)(B) and (c)(2)(B) of this section (pertaining to periodic emissions reduction requirements).

42 U.S.C. § 7511a(d)(1)(A) (emphasis added).  Per the plain language of section

182, states containing a severe or extreme nonattainment area for ozone must adopt

TCMs for two independent purposes:  "to offset any growth in emissions from

growth in vehicle miles traveled … *and* to attain reduction in motor vehicle

emissions as necessary … to comply with the requirements of subsection (b)(2)(B)

and (c)(2)(B)."[13]  *Id*. (emphasis added).  EPA's approach, allowing a state to ignore

growth in emissions from growth in VMT so long as the state can "demonstrat[e]

---

[13] The reference to "(b)(2)(B)" refers to 42 U.S.C. § 182(b)(2)(B), which requires that plans demonstrate that they include reasonably available control technology. The reference to "(c)(2)(B)" refers to 42 U.S.C. § 182(c)(2)(B), which requires plans submitted to EPA show that  they will achieve reasonable further progress, which sets a percentage of reductions that a plan must achieve by certain dates between plan approval and the attainment date.

… declining motor vehicle emissions each year through the attainment year," ER, at 005-06, gives effect to the second clause of the sentence but ignores the first.

EPA's reading thus violates the "cardinal principle of statutory construction" that "a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (internal quotation marks and citations omitted); *see also Colautti v. Franklin*, 439 U.S. 379, 392 (1979) (it is an "elementary canon of construction that a statute should be interpreted so as not to render one part inoperative,"); *U.S. v. LSL Biotechnologies*, 379 F.3d 672, 679 (9th Cir. 2004) ("[W]e strive to avoid constructions that render words meaningless."). Indeed, as this Court has opined previously, "We cannot assume that Congress intended two separate provisions in the same sub-section to have the same meaning." *Padash*, 358 F.3d at 1171. EPA's interpretation of section 182 renders the statute's strict, specific requirement to adopt TCMs to offset VMTs superfluous and insignificant and ascribes the two clauses of section 182(d)(1)(A) with the same meaning. Because it is incompatible with a "cardinal principle of statutory construction," EPA's interpretation of section 182(d)(1)(A) is unlawful and the Final Rule, predicated on the agency's flawed interpretation, must be vacated and remanded.

In the Final Rule EPA attempts to invoke statutory context in support of its toothless interpretation of section 182, arguing that a strict requirement for severe ozone nonattainment areas to offset growth in VMTs could result in the imposition of "draconian TCM's [sic] such as no drive restrictions."  ER, at 004.  According to EPA, the agency doubts that Congress "believed at the time it voted to pass the [1990 Amendments] that the words of this provision would impose such severe restrictions."  *Id.*  This argument is disingenuous and self defeating.  First, the suggestion that TCMs are necessarily "draconian" is false.  The District initially proposed to adopt several modest but effective TCMs to comply with section 182(d)(1)(A), *see generally* ER, at 203-231,[14] before controversially withdrawing the measures from its proposed  plan.  ER, at 004.

Second, and more importantly, Congress was unquestionably aware of the potential consequences of requiring adoption of TCMs, as Congress itself prescribed the list of TCMs that states could implement to offset VMT.  *See* 42 U.S.C. 7511a(d)(1)(A) ("The State shall consider measures specified in section 7408(f) of this title, and choose from among and implement such measures as necessary to demonstrate attainment with the national ambient air quality

_____

[14] CARB's SIP revision initially included plans to expand and improve:  (a) HOV lanes; (b) bus, rail, and shuttle transit; (c) park and ride lots; and (d) bicycle and pedestrian facilities.  The SIP revision also included information-based programs intended to promote and popularize alternatives to single occupancy vehicle commute trips.  *See* ER, at 178-79.

standards; …").[15]  EPA concedes that Congress established "intricate planning

requirements … to bring areas toward attainment of the ozone standard," ER, at

005-06, but EPA's interpretation of section 182(d)(1)(A) glosses over the specific,

intricate requirements of the statute.  The Court "must reject those constructions

that … frustrate the policy Congress sought to implement," *Biodiversity Legal*

*Foundation v. Badgley*, 309 F.3d 1166, 1175 (9th Cir. 2002) (citing *Eisinger v.*

*Fed. Labor Relations Auth.*, 218 F.3d 1097, 1100-01 (9th Cir.2000)), and overturn

EPA's unlawful interpretation.

The legislative history of section 182 provides a final refutation of EPA's

interpretation.  As noted above the House Committee Report on section 182 states

unequivocally:  "The baseline for determining whether there has been growth in

emissions due to increased VMT is the level of vehicle emissions that would occur

if VMT held constant in the area."  2 Legis. Hist. at 3266 [AD, at 81].  EPA does

not dispute the House Committee Report but avers that it isn't persuaded because

"[t]here is no further legislative history on this aspect of the provision."  ER, at

004.  EPA is completely mistaken.  For example, many months after the House

Committee Report, during the House debate on the conference report,

---

[15] CAA § 108(f)(1)(A) lists 26 TCMs, including "programs for improved public
transit," "restrictions of certain roads or lanes to … high occupancy vehicles," "trip
reduction ordinances," "programs … for the convenience and protection of
bicyclists," and "programs to control extended idling of vehicles."  42 U.S.C. §
7408(f).

Representative Manton invoked the House Committee Report, declaring that "The House report language …on the specific provisions *to offset growth in vehicle miles traveled* in severe ozone nonattainment areas[] makes it clear this is a requirement on the States in revising their State Implementation Plans."  1 Legis. Hist. at 1304 [AD, at 76] (statement of Rep. Manton on Conference Report). Additionally, the language of section 182(d)(1)(A) originated with the Senate bill, 3 Legis. Hist. at 4214-15 [AD, at 86-87] (S. 1630, 101st Cong. (1990)), and the Senate Committee Report read very similarly to the House Committee Report, stating:  "Severe and extreme areas are *required to offset growth in vehicle miles traveled* by implementing the transportation controls listed in revised section 108(f) of the Act …"  5 Legis. Hist. at 8384 (S. Rep. 101-228 (1989)) [AD, at 100] (emphasis added).  Significantly, the House Committee Report, the Senate Committee Report, and Representative Manton's floor statement are phrased in terms of directly offsetting VMT or VMT emissions, as opposed to taking EPA's position that TCMs must only be adopted when VMT emissions contribute to an overall increase in vehicle fleet emissions.

Section 182(d)(1)(A) addresses VMT directly and independently from other factors affecting automobile emissions and ozone levels because, as Congress was aware at the time of section 182's adoption, increases in VMT undermine the

57

achievement of air quality objectives.  As the Conference Report submitted by

conferee Senator Baucus explains:

> The experience of the last 20 years makes clear that we
> cannot solve the air pollution crisis in major polluted
> areas like … Los Angeles only by controlling industrial
> sources or making new cars cleaner. … In addition, we
> have learned that the growth in vehicle use, nearly three
> percent per year nationwide, was a major factor in
> preventing the attainment of the ambient standards by the
> 1987 deadline.
>
> It is clear that the goals of this bill—healthy and safe air
> for every American—will not be achieved without
> implementing strategies that effectively limit the growth
> in vehicle use in the major urban centers where pollution
> levels are the worst.

1 Legis. Hist. at 1006-07 [AD, at 73-74] (Baucus Clean Air Conference Report).

Senator Lieberman expressed the same sentiment, declaring that "In addition to

strict controls on emissions from motor vehicles, the Senate bill recognizes that,

*for some parts of the country, it may become necessary to implement*

*transportation control measures to reduce our reliance on the automobile*."  4

Legis. Hist. at 4878 [AD, at 94] (statement of Sen. Lieberman).

The Court "interpret[s] a federal statute by ascertaining the intent of

Congress and by giving effect to its legislative will," *Padash v. INS*, 358 F.3d

1161, 1168 (9th Cir. 2004) (*citing Hernandez v. Ashcroft*, 354 F.3d 824, 838 (9th

Cir. 2003)), and must reject an agency's interpretation if it has "no foundation in

the statute or legislative history."  *Quinlivan v. Sullivan*, 916 F.2d 524, 526-27 (9th

58

Cir. 1990).  Congress intended severe ozone nonattainment areas to adopt enforceable TCMs to offset any emissions resulting from an increase in VMT. This intent is manifested in the plain statutory language and clear statutory structure and verified by directly relevant legislative history.  When "the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*. at 842-43.  EPA's "alternative" interpretation of section 182(d)(1)(A) is inconsistent with the plain language of the statute and the agency's approval of the South Coast Plan—which lacks enforceable TCMs to offset growth in VMT—is therefore unlawful. *Maislin Indus. v. Primary Steel, Inc.*, 497 U.S. 116, 134-35 (1999) (an agency "does not have the power to adopt a policy that directly conflicts with its governing statute").

//

//

## VI.    CONCLUSION AND RELIEF REQUESTED

For the foregoing reasons, the Court should vacate the Final Rule and remand to

the matter to EPA.

Petitioners also respectfully request that they be awarded the costs of

litigation, including reasonable attorneys fees, pursuant to 42 U.S.C. § 7607(f).

Dated: August 21, 2009          /s Adriano L. Martinez
                                DAVID PETTIT
                                MELISSA LIN PERRELLA
                                ADRIANO MARTINE
                                Natural Resources Defense Council

                                *Counsel for Natural Resources Defense Council*

                                /s Marybelle N. Nzegwu
                                MARYBELLE N. NZEGWU
                                BRENT J. NEWELL
                                Center on Race, Poverty & The Environment

                                *Counsel for Association of Irritated Residents, El Comité Para El Bienestar De Earlimart, and Community Children's Advocates Against Pesticide Posioning*

**CERTIFICATE OF COMPLIANCE**

I certify that pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure and Ninth Circuit Rule 32-1 and Ninth Circuit Rule 28-4, the attached brief is proportionally spaced, has a typeface of 14 points or more, and contains 14,256 words, exclusive of those parts of the brief exempted by Rule 32 (a) (7)(B)(iii).  I have relied on Microsoft Word's calculation feature to calculate the word limit.

August 21, 2009

/s Adriano Martinez
Adriano Martinez

**PROOF OF SERVICE**

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is: 1314 2nd Street, Santa Monica, CA 90401.

On August 21, 2009 I electronically filed the foregoing document described as PETITIONER'S OPENING BRIEF, with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that the below participants in this case registered as CM/ECF users will receive electronic service accomplished by the appellate CM/ECF system. I also certify that those listed below who are not registered as CM/ECF users will receive the exact same document filed with the CM/ECF system by electronic service via email and USPS.

Austin D. Saylor
U.S. Department of Justice
Environment and Natural Resources Division
Environmental Defense Section
P.O. Box 23986
Washington, DC 20026-3986
(202) 514-1880 (t);  (202) 514-8865 (f)

FedEx Address:
601 D Street, NW, Suite 8000
Washington, D.C. 20004

___ (State) I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

 **X** (Federal) I declare that I am employee in the office of a member of the bar of this court at whose direction the service was made.

Executed on August 21, 2009, at Santa Monica, California.

/s Alana Karran
Alana Karran

62